

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00281-CV

_____

JONATHAN STICKLAND AND JACKIE SCHLEGEL, TEXANS FOR VACCINE FREEDOM, AND TEXANS FOR VACCINE CHOICE PAC, Appellants

V.

JACKIE SCHLEGEL AND TEXANS FOR VACCINE CHOICE, Appellees

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-330567-21

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

## I. Introduction

This case involves two sets of claims against different defendants. First, Texans for Vaccine Choice (Choice-C4), a 501(c)(4) nonprofit corporation, sued Texans for Vaccine Freedom (Freedom-C3), a 501(c)(3) nonprofit corporation; Texans for Vaccine Choice Political Action Committee (the PAC); and Jackie Schlegel (collectively, the Schlegel Defendants) to stop them from controlling Choice-C4's social media, misusing its confidential information, and speaking on Choice-C4's behalf, among other things.

Second, Schlegel sued Jonathan Stickland as a counter-defendant, alleging that he had defamed her; he moved to dismiss that claim under the Texas Citizens Participation Act (TCPA).[1] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011. In her TCPA response, Schlegel conceded, for purposes of Stickland's TCPA motion,

---

[1]Under the TCPA, the first step is for the movant to show that the lawsuit is "based on or is in response to" the movant's exercise of the rights of free speech, petition, or association, "or arises from any act of that party in furtherance of the party's communication or conduct described by Section 27.010(b)." Tex. Civ. Prac. & Rem. Code Ann. §§ 27.003(a), .005(b). No one argues that Section 27.010(b) applies.

If a TCPA movant satisfies its first-step burden, and no exemption applies, *see Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018), then to avoid dismissal, the nonmovant must establish by clear and specific evidence a prima facie case for each essential element of the claim in question. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(c). If the nonmovant meets this burden, then the movant may still obtain a dismissal if it establishes an affirmative defense or other grounds on which it is entitled to judgment as a matter of law. *Id.* § 27.005(d).

that she was a limited-purpose public figure and that the TCPA applied to her defamation claim.

Following Stickland's example, the Schlegel Defendants then moved to dismiss some of Choice-C4's claims under the TCPA. *See id.* After the trial court denied both TCPA motions, Stickland and the Schlegel Defendants separately brought timely interlocutory appeals. *See id.* §§ 27.008(b), 51.014(a)(12).

We conclude that Schlegel failed to meet her prima facie burden, sustain Stickland's second of three issues, reverse the trial court's order denying his motion, and render judgment dismissing Schlegel's defamation claim against him. Because Stickland's second issue is dispositive, we do not reach his remaining issues regarding TCPA evidence and whether he established an affirmative defense. *See* Tex. R. App. P. 47.1.

We overrule the Schlegel Defendants' first two issues because—as to Schlegel and Freedom-C3—their TCPA motion was untimely, and as to the PAC, Choice-C4's claims fall under a TCPA exemption. Based on this resolution, we do not reach their third issue, in which they challenge Choice-C4's ability to show a prima facie case for each element of its claims. *See id.* We affirm the trial court's order denying the Schlegel Defendants' TCPA motion and remand the case to the trial court to determine attorney's fees, costs, and potential sanctions, *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.009, and deny Choice-C4's cross-point request for sanctions under Rule of

Appellate Procedure 45 because, as set out below, the Schlegel Defendants' appeal contains at least one arguable issue.

## II. Background

We compile below the relevant facts that the parties supplied to the trial court.

## A. Choice-C4, Freedom-C3, and the PAC

Schlegel and Rebecca Hardy, among others, founded the entities in this case. Hardy filed the paperwork to create the PAC in July 2015 and Choice-C4 in August 2015. The day after its formation, Choice-C4 opened a Frost Bank account with a $60 deposit; it eventually paid payroll from that account. A little over a year later, Hardy filed the paperwork to create Freedom-C3 and filed a "consent to use similar name" because Freedom-C3 was the "second organization with a similar purpose consisting of a similar Board of Directors."

Choice-C4, as a 501(c)(4) nonprofit corporation, took part in lobbying activities while Freedom-C3, because of its 501(c)(3) constraints, limited its activities to authorized educational efforts.[2] Schlegel began serving as Choice-C4's executive director in late 2016 and worked for both Choice-C4 and Freedom-C3. In April 2021,

---

[2]In their cross-appellants' brief, the Schlegel Defendants explain that contributions to a 501(c)(3) charitable organization like Freedom-C3 are tax-deductible, in contrast to contributions to a 501(c)(4) social-welfare corporation like Choice-C4, which are not, and that a 501(c)(4) organization may engage in political lobbying, while a 501(c)(3) organization may not. *See generally* 26 U.S.C.A. § 501(c)(3)–(4).

4

Hardy, who had been the PAC's treasurer, appointed Schlegel as the PAC's treasurer, and Schlegel signed employment agreements with Choice-C4.

Between 2015 and 2021, Choice-C4's funds grew substantially. Funds were internally transferred *to* Choice-C4's account but—except for paying debit items— funds were not transferred *from* Choice-C4's account until November 18, 2021.

## B. Transfer of Choice-C4's funds to Freedom-C3

On November 16, 2021, Schlegel asked Heather Jones, Choice-C4's office manager, for information about Choice-C4 and Freedom-C3's directors, and Jones pointed her to each organization's books. At that time, Schlegel sat on Choice-C4's board with Hardy and Christine Welborn; Freedom-C3's board comprised Schlegel, Hardy, and Joel Starnes. According to Jones, after Schlegel looked at Freedom-C3's directors list, she mused aloud that she "would at least have [Freedom-C3]." The next day (November 17), Schlegel, Hardy, Welborn, and Starnes scheduled a November 19 board meeting for both entities to address "concerns." According to Hardy, the meeting's goal was to "redirect" Schlegel in her work with Matt Langston, a consultant.[3]

---

[3]In its first amended petition, Choice-C4 alleged that in the fall of 2021, Choice-C4 and Freedom-C3 staff reported to both organizations' boards concerns about Schlegel's behavior, her authority, and the "new" direction in which she was taking them, which included unauthorized expansions outside of Texas, "a partisan withdrawal from criticism of Republican elected officials," a refusal to call for a fourth special legislative session to address vaccine policy, and "the outsourcing of management to a third-party contractor."

On November 18, at 3:28 p.m.,[4] Schlegel emailed Langston, stating,

I know we have discussed using the 501c3 to expand nationally. And since we have wrapped up legislation and there are no foreseeable special sessions, I think it would be wise to transfer 80% of the funds from the 501C4 to the 501C3 which employs the staff and covers the operating expenses. Typically, in the past [Hardy] moved funds as needed, with no policy or structure in place. However, I think it should be a standing policy that after the legislative session, remaining C4 money is used to develop the C3.

Current C4 is 145,193.17[.]

Transfer to C3 will be 116,154.54[.]

This will also create a good push for legislative fundraising as we can communicate the need for funds to fight at the Capitol.

A few minutes later, Langston told her that sounded good.

At some point that afternoon, Schlegel texted Jones for help logging into Choice-C4's Frost account. When Jones replied, Schlegel told her that she had managed to log in on her phone and told Jones, "I can't afford a [F]rost lockout today." Later, Schlegel called Frost, which also held the Freedom-C3 and PAC accounts, and asked the bank to transfer $116,154.54—80% of Choice-C4's account balance—into Freedom-C3's account. Choice-C4 filed as an exhibit Schlegel's recorded and transcribed conversation with the Frost representative.

---

[4]Choice-C4's evidence showed that when Schlegel began drafting the email at 11:26 a.m., she first addressed Langston and Starnes before changing the message to just Langston, at 11:30 a.m. At 12:34 p.m., she changed the message again to just Starnes before changing it back to Langston at 2:18 p.m. At 2:38 p.m., she changed it from Langston to Choice-C4. Ultimately, she addressed the email to Langston.

6

Schlegel told Frost's representative, "I am needing to make a transfer in between two of my accounts and on-line there is a limit and I was wondering how I could go about that." Frost's representative noted the $25,000 maximum for an on-line transfer but noted that a larger transfer could be accomplished over the phone. During the conversation, Schlegel stated, "So we regularly transfer funds," and "[W]e had decided on [the $116,154.54 transfer] number based on 80 percent of the basing and the cash on hand." The Frost representative replied that her supervisors wanted to know the nature of the payment for the account's security "because it's [Frost's] first time transferring to this particular account." Schlegel told her that it was "to support our educational foundation," complimenting the bank on its security. Frost's representative confirmed and then completed the transfer.

Jones, who had been monitoring Choice-C4's bank account after Schlegel's text, saw that shortly after 5 p.m., Choice-C4's account dropped to $29,038. She checked Freedom-C3's account and saw the $116,154.54 transfer, which she said "was unexpected and completely out-of-the-ordinary" because there was no financial reason—such as payroll—for such a large transfer. Jones reported the transfer to Hardy, who asked her to contact Frost for an explanation and to reverse the transfer.

Like Schlegel's conversation with Frost, Jones's conversation was also recorded and transcribed, and Choice-C4 filed it as an exhibit. Jones first asked the Frost representative if she could undo or reverse the transfer, and after some back and forth, the transfer was ultimately reversed that night.

7

## C. The transfer's aftermath

After the transfer, Hardy and Welborn conducted a telephonic Choice-C4 board meeting at which, according to Hardy, they fired Schlegel and removed her from the board.[5] The next morning, Choice-C4's counsel, Emily Cook, emailed Schlegel, copying Starnes, to inform Schlegel that "after the criminal activity that transpired last night regarding the [Choice-C4] bank account," Hardy and Welborn had removed Schlegel as Choice-C4's executive director and had removed her from Choice-C4's board. Cook told Schlegel that they would discuss "next steps to effectuate a mediation between the two entities and personnel" at the scheduled joint board meeting that afternoon.

After the meeting, Schlegel contacted JoAnn Fleming, who operated a quarterly grassroots summit, to tell her that Choice-C4's information in the summit's booklets and PowerPoint slides would have to be changed before that weekend's upcoming summit, one that involved 200 leaders from across Texas.[6] Fleming then contacted Schlegel's friend, Teresa Beckmeyer, a senior political-donor advisor, and "let [her] know about what was going on" with the summit materials. According to Beckmeyer,

---

[5]The Schlegel Defendants contend that Hardy and Welborn "purportedly terminated" Schlegel as Choice-C4's executive director.

[6]According to a subsequent letter from Cook to Schlegel, during the November 19, 2021 meeting, Schlegel "agreed to identify [her]self as [Freedom-C3] during" the grassroots summit, agreed not to hold herself out at the event as speaking on behalf of Choice-C4, and agreed to confidentiality about the meeting. But the record contains no such written agreement.

8

they had to cover over Schlegel's name in the booklet, which caused some murmuring but not a lot of discussion.

At the summit, Schlegel told Beckmeyer that Choice-C4's board had asked her to take a leave of absence. Schlegel also told her "that she had transferred money from [Choice-C4] to [Freedom-C3], and that they were saying that she had stolen money," but that, in Schlegel's view, she did not think she had stolen money. Beckmeyer speculated that Schlegel had spoken with several people at the summit.[7]

Beckmeyer was also friends with Stickland—another political-donor advisor—and Starnes. She spent five hours on the phone with Stickland after he called her during her drive home from the summit the following Monday. Beckmeyer did not recall everything she talked about with Stickland during that extensive conversation but noted that as they talked about different Texas groups that had complained to her about Stickland's intruding into their business, Stickland said, in a matter-of-fact manner, "Have you heard [Choice-C4] is having a problem, [Schlegel] stole money."

After Stickland said this about Schlegel, Beckmeyer asked him, "[D]o [y]ou know that for a fact?" Stickland replied, "Well, no, [Choice-C4's] board has told me this." She then asked him if he had contacted the board for proof, and he said that he had not. Beckmeyer then asked if he had reached out to Schlegel for the facts because

---

[7]When Beckmeyer spoke with Schlegel at the summit about the preceding days' events, Fleming, Jill Glover, and one or two others were present, and "there were people everywhere."

Stickland and Schlegel had "always been such good friends," and he said that he had not done that either.

Beckmeyer told Stickland that he needed to contact Schlegel and the board to get all the facts "before [he is] telling this to people." Stickland retorted that he was not going to contact anyone because Beckmeyer had just told him that people were complaining about his "getting into their business."[8] Beckmeyer stated in her deposition that she could not understand why Stickland would not reach out to Schlegel, whom he had helped to build Choice-C4. She did not tell Stickland that she already knew that Choice-C4's board had accused Schlegel of stealing money, because Schlegel had told her that "they were going to press charges or something on her if she told people about it." Beckmeyer had no personal knowledge that Stickland told anyone other than her that Choice-C4's board had told him that Schlegel had stolen money.

After she arrived home, Beckmeyer spoke with Starnes, who told her that, at the joint board meeting, Hardy and Welborn had told Schlegel that in their view, she had stolen the money. He told Beckmeyer, "[T]hey're saying she stole money, but she

---

[8]Beckmeyer noted in her deposition that as donor advisors, she and Stickland were to recommend "whether to financially support a group," not to run a group themselves.

was transferring from one entity to another entity."[9] Starnes did not tell Beckmeyer anything she had not already heard.

While Beckmeyer was on the phone with Starnes, he received Choice-C4's November 22 demand letter from Cook to Schlegel; he read portions of it to Beckmeyer and forwarded it to her the next day. That letter recited the "possible civil violations regarding the transfer of funds on November 18, 2021," including Business Organizations Code violations related to transferring 80% of Choice-C4's assets without due consideration for other expenses, which "would have likely rendered the corporation insolvent," as well as other fiduciary-duty breaches and civil conspiracy. The letter stated that despite Schlegel's attempt to "paper" reasons for the transfer earlier that day in her email to Langston, "credible evidence suggests [she] initiated the bank transfer from an entity [she] reasonably anticipated being voted off of within the next 24 hours at the regularly scheduled board meeting to an entity [she was] confident [she] had governance control of."

Cook's letter also accused Schlegel of having breached their November 19 agreement to identify herself only with Freedom-C3 during the summit, stating

---

[9]Without citing authority, the Schlegel Defendants assert that the type of transfer that Schlegel attempted "is permissible." Choice-C4, on the other hand, states that because of Freedom-C3's limitations as an educational organization and its ability to raise tax-deductible funds, "funds never flowed from [Choice-C4] to [Freedom-C3]," and it asserts that Schlegel needed board approval for such a significant transfer from one entity to another and that the type of transfer was unprecedented, referring us to Choice-C4's bank statements.

11

that event-related information showed that she "did not change [her] PowerPoint slides to not reflect [Choice-C4], held [her]self out as speaking on behalf of [Choice-C4] after [her] termination of employment from that entity[,] and did not speak on behalf of [Freedom-C3] as agreed."[10] Cook stated that Choice-C4 had "heard several reports of the breaking of the confidentiality agreement from Friday" and that based on those events, Choice-C4's board felt "strongly that reconciliation and reinstatement is likely impossible."

Choice-C4 offered Schlegel one year's severance in exchange for her signing nondisclosure and noncompete agreements, as well as her immediate resignation from Freedom-C3's board; gave her until 10 a.m. on November 29 to accept the terms; and asked Schlegel to return Choice-C4's intellectual property within 15 business days. Cook's demand letter also recommended that Schlegel seek legal counsel to "provide an avenue where the two boards and respective staff would not have to engage with each other, which would be advisable given the feelings, heartache[,] and personal relationships involved."

After Beckmeyer spoke with Starnes, she exchanged texts with Stickland. The conversation began with Beckmeyer's stating that nothing on Choice-C4's (or Freedom-C3's)[11] Facebook feed had led her to believe that "they are drifting to the

_____

[10]As we noted, the November 19 agreement is not in the appellate record.

[11]It is unclear whether Beckmeyer meant Choice-C4 or Freedom-C3 because she wrote "TFV," and throughout the case the parties have referred to the

12

wrong side." Stickland then told her he was referring to Choice-C4's emails and Facebook ads. Beckmeyer opined that they would never win when they were "devouring each other!"

When Stickland stated, "No one is devouring [Schlegel.] They were trying to help her and give her time to get her life straight[.] They are still trying[.] Those women love each other[,]" Beckmeyer replied, "Yeah, tell me that after reading the civil suit she was given this evening." She added, "This [Schlegel] thing is about to split the grassroots wide open. Mark my words. I hope those involved can live with themselves afterwards." She told Stickland that she had been talking with Starnes when he received the demand letter and that it was "horrible." She then asked Stickland why, if Choice-C4's emails and Facebook ads had bothered him, he had not called Schlegel. Stickland replied that he had talked with Schlegel months ago about Choice-C4's going in a different direction.

Stickland asked Beckmeyer if she had spoken to Welborn or Hardy; she hadn't yet. Stickland then told her, "Maybe ask [Starnes] why him and his wife blocked me and haven't spoken one word to me." Beckmeyer replied, "That's not my business." Stickland responded, "I'm just saying, the people talking about all of this don't seem to be [Hardy] and the rest," and he said that he was "told [undescribed] things" on the

---

organizations as TFVC and TFVF. To make the distinctions hopefully clearer, we have chosen "Choice-C4" and "Freedom-C3" as shorthand references.

morning of the board meeting. He also noted that Starnes had talked to many people. Beckmeyer replied, "Someone's life was just destroyed. Do you not get that?"

Stickland told Beckmeyer,

If anyone is trying to destroy someone I'd like to know. You're telling me thing[s] [I] haven't heard. Civil suit etc[.] I was told she was offered a year of full salary to take off and deal with family[.] That's hardly destroying someone's life if true[.] If there's more to the story then I'd be happy to know it. I'm not for destroying or devouring [Schlegel]. I'm also not OK with ruining a grassroots org[.]

Beckmeyer replied, "To clarify[,] there were a bunch of demands and if she doesn't comply by Monday, they will file a civil suit against her."

Stickland cautioned Beckmeyer to be careful, stating, "[T]he women on the other side are not selfish monsters[.] . . . I highly doubt they took this lightly[.] Especially if they are filing suits, that's a big deal. If they don't have hard proof[,] they are fools[.] And I don't believe they are fools[.]" When Beckmeyer asked for an explanation, he said, "It means I'm sure [Starnes] has one side and we should gather facts from all places. Not fair to assume he's right. We don't know what he knows or doesn't know[.]" Four days later, Starnes told Beckmeyer, "We hired [attorney] Tim Davis. He is good."

On November 29, 2021, Choice-C4 sued Schlegel and Freedom-C3[12] and sought a temporary restraining order and temporary and permanent injunctive relief,

---

[12]In its original petition, Choice-C4 also sued Engage Right, a consulting firm, and Langston, Engage Right's agent, but later dropped them from the lawsuit.

as well as damages for trademark and logo infringement, trade-secrets and common-law misappropriation, and tortious interference with prospective business relations. On December 1, the trial court granted the TRO in part.

**D. Choice-C4's amended petition**

Choice-C4 amended its petition on January 31, 2022, adding the PAC to the lawsuit. Choice-C4 dropped its trade-secret and common-law misappropriation claims but kept its trademark- and logo-infringement claims; it added claims against all the Schlegel Defendants for tortious interference with business relations and contracts and claims against Schlegel for breaches of contract and fiduciary duty. Choice-C4 also sought declaratory relief regarding the exclusive continued use of Choice-C4's name and logo, control of the PAC, and return of donations, among other things.

**E. Schlegel Defendants' counterclaim; Schlegel's defamation claim**

The Schlegel Defendants filed an answer on February 11, 2022, and counterclaimed for a declaratory judgment that Schlegel's removal from Choice-C4's board was ineffective, *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.003, and for harmful access by computer, *see id.* § 143.001. Schlegel added Stickland as a counter-defendant, alleging defamation based on his telling Beckmeyer that Schlegel "stole money." Schlegel also alleged that Stickland had made other defamatory comments, stating,

> On information and belief, Mr. Stickland has made similar defamatory comments to numerous other individuals, including current, and potential, donors to [Choice-C4] and [Freedom-C3] as well as Texan grassroots organizers and supporters. For example, there was a meeting of a dozen or so Texas grassroots leaders in December 2021. During

that meeting, the attendees were asked whether any of them had heard that Ms. Schlegel had stolen money. All the attendees confirmed that [they] had heard those accusations. Many of those attendees heard the "stole money" accusations from Stickland or his allies.[13]

She also alleged that Stickland told Julie McCarty, another grassroots organizer, that she stole money from Choice-C4, and she included a screenshot of an undated McCarty Facebook post:

> [T]here's a lot to this story that has not come out yet. For starters, Jackie stole over $100,000 from [Choice-C4], she was planning to give an award to Abbott, and she was telling her staff that grassroots are doing it all wrong and need to work with the establishment. The staff was so alarmed they asked Rebecca [Hardy] to step in and help. Jackie has gone off the deep end. It's sad. What is especially sad is that she's taking good but deceived people with her. I stand with Jonathan and others who are tried and true friends and patriots. The people now advising Jackie are well known for operating with a "the ends justifies the means," anything-goes mentality. I know them well, and it's not the first time we've butted heads. Please know that Jackie fired the consultant she was paying $150/mo as a token payment and hired these guys who are charging her $10,000/mo.

Schlegel alleged that "[t]he reference to 'Jackie'" meant her, and the reference to "Jonathan" meant Stickland.[14]

---

[13]During her deposition, Beckmeyer stated that at a mid-December 2021 grassroots meeting, she told a dozen people that she did not believe that Schlegel had stolen money.

[14]During her deposition, Beckmeyer testified that McCarty had made a Facebook post about how Schlegel stole $100,000. Beckmeyer did not respond to the post but, although it shocked her, she did not think it was "right, wrong, or whatever," because McCarty was "known for doing those kinds of posts."

## F. Interim activities

In mid-March 2022, Beckmeyer, Fleming, and Glover met with Choice-C4's board to hear its side of the story. Hardy recorded the meeting but, although it was transcribed, the only speaker identified was a "Mr. Olcott"; the others showed up as "female speaker." Either Welborn or Hardy said the following:

- "We were the rest of the C4 board. We were not contacted, and all of a sudden this money moves when she knows that we're about to have a board meeting. It looks really bad from our perspective";

- Hardy had moved money from the PAC to Choice-C4 "regularly," with legal advice;

- There was a "huge difference" between moving money from the PAC and moving money from a "C4 to C3"; and

- They had intended to offer Schlegel a year of bereavement leave at the November 19 meeting because they thought Schlegel was making bad decisions while grieving her mother's death.

Beckmeyer agreed in her deposition that Schlegel had initiated the money transfer from Choice-C4 to Freedom-C3 and that whether she was authorized to do so was disputed.

## G. TCPA motions

On April 4, 2022, Stickland moved to dismiss Schlegel's defamation claim, and a few days later, on April 12, the Schlegel Defendants moved to dismiss most of

Choice-C4's claims,[15] arguing that they were based on and in response to Schlegel's rights of free speech and association.

On May 24, Schlegel filed an amended petition and her response to Stickland's TCPA motion. To that response she attached a copy of her amended petition, an excerpt from the transcription of Beckmeyer's March meeting with Choice-C4's board, her unsworn declaration, and excerpts from Beckmeyer's deposition. Stickland filed a TCPA reply on May 27.

## H. May 31, 2022 hearing

The trial court heard argument first on the Schlegel Defendants' motion, then on Stickland's.

### a. The Schlegel Defendants' TCPA motion

The Schlegel Defendants argued that their April 12 motion was timely because Choice-C4 never served them, that they appeared when they answered in February, and that their activities before answering were insufficient to constitute an appearance. They also argued that no TCPA exemptions applied.

Choice-C4 replied that on December 1, the Schlegel Defendants' attorney "argued at the [TRO] hearing, and then he entered an agreed TRO," thus entering an appearance. Choice-C4 contended that filing its amended petition on January

_____

[15]Schlegel's counsel clarified at the TCPA hearing that she did not seek to dismiss Choice-C4's claims relating to disclosure and failure to return confidential information as a breach of fiduciary duty or declarations 5 and 6 relating to the return of tangible property and donations.

18

31 triggered the 60-day TCPA deadline, which ended on April 1. Choice-C4 conceded that the PAC, a new addition, appeared on February 12 and thus had until April 13 to file its TCPA motion. Choice-C4 further argued that this was an internal corporate dispute to which the TCPA did not apply, that Schlegel's agreements with Choice-C4 placed the claims under TCPA exemptions, and that Choice-C4 had met its prima facie burden.

### b. Stickland's TCPA motion

Stickland informed the trial court that Schlegel had conceded that the statements involved a matter of public concern and that she was a public figure, shifting the burden to her. He argued that Schlegel's response contained an insufficient record to support her prima facie burden, particularly compared to the "thousand pages of evidence" attached to Choice-C4's response to the Schlegel Defendants' TCPA motion.[16]

Stickland argued, among other things, that his statement to Beckmeyer was substantially true because Schlegel had transferred the money and lacked any facts to prove otherwise. He also stated that as to the McCarty Facebook post, nothing in it

---

[16]Stickland's counsel told the trial court that he had expected to see affidavits from the people who had allegedly said that Stickland told them that Schlegel had stolen money but had instead received Schlegel's first amended petition, six or seven pages of transcript "from a recorded board meeting that's not very relevant," and an affidavit from Schlegel that did not mention anything about Stickland's statements and that "look[ed] like it was drafted for a different type of lawsuit, different type of claim."

19

suggested that Stickland had told McCarty anything. He argued, "There's no ['[he said/[s]he said.['] There's not even a ['[he said['] here."

Schlegel replied that the theft allegation was false because Hardy and Welborn would not have offered her a year's severance otherwise,[17] and she relied on the amended petition's allegations about what Stickland knew.

## III. Discussion

On appeal from the denial of his TCPA motion, Stickland argues that Schlegel did not meet her prima facie burden, while Schlegel responds that Stickland "seeks to use the TCPA to escape potential liability for publishing lies that [she] committed a crime, which she did not do." In its appeal, Choice-C4 argues that Schlegel and Freedom-C3's TCPA motion was untimely and that its claims fall under at least one TCPA exemption. We will address Choice-C4's timeliness complaint first.

### A. Timeliness of Schlegel and Freedom-C3's TCPA motion

#### 1. Expedited dismissal

The TCPA contemplates an expedited dismissal procedure for claims brought to intimidate or silence a defendant's exercise of the rights to petition, speak freely, associate freely, and otherwise participate in government to the maximum lawful extent without impairing another's right to file a meritorious lawsuit for demonstrable

---

[17]In her TCPA response, Schlegel argued that the statement, "Jackie stole money [from Choice-C4]," was false "because [Choice-C4] lost no money due to any action by Schlegel" and because she "had the authority to transfer money from [Choice-C4] as its executive director and board member."

injury. *See* Tex. Civ. Prac & Rem. Code Ann. §§ 27.002–.003. It requires "early dismissal of qualifying legal actions when the plaintiff lacks evidence of any essential element of its claim." *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 198 (Tex. 2023); *see Avid Square Constr., LLC v. Valcon Consulting, LLC*, No. 02-22-00297-CV, 2023 WL 3113950, at *2 (Tex. App.—Fort Worth Apr. 27, 2023, no pet.) (mem. op.) (stating that the TCPA provides "an expedited procedure for the early dismissal of groundless legal actions that impinge on First Amendment rights").[18] The TCPA is intended as a "bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019).

---

[18]During this case's oral arguments, questions arose about the different evidentiary burdens for TCPA and summary-judgment motions, but we note that both procedures' goal is the same: either may be used "to eliminate patently unmeritorious claims." *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989) (quoting *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n.5 (Tex. 1979), and discussing what a non-media defendant must show to obtain a traditional summary judgment in a public-figure defamation action). As noted in *Casso*, if an affiant's or a deponent's credibility is likely to be a dispositive factor, then summary judgment is inappropriate. *Id.* at 558. The same must hold true for the TCPA, which has an even lower evidentiary threshold. *See In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding) (explaining that a prima facie case refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted); *see also Van Der Linden v. Khan*, 535 S.W.3d 179, 195 (Tex. App.—Fort Worth 2017, pet. denied) ("But just as conjecture, guess, or speculation will not survive a proximate cause sufficiency challenge in the summary judgment context, conjecture, guess, or speculation cannot survive 'clear and specific' scrutiny under chapter 27."). If the record reflects no need for a credibility determination, then an issue may be decided as a matter of law. *See Casso*, 776 S.W.2d at 558.

Among its balancing measures, the TCPA imposes a 60-day deadline to seek dismissal of actions within its purview. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(b); *see also Montelongo v. Abrea*, 622 S.W.3d 290, 293–94 (Tex. 2021) (stating that the 60-day period may be renewed if an amended or supplemental petition adds new parties, alleges new essential facts to support previously asserted claims, or asserts new legal claims or theories involving different elements than the claims or theories previously asserted, but only as to those new parties, facts, or claims). A trial court does not err by denying an untimely filed TCPA motion. *Patriot Contracting, LLC v. Mid-Main Props., LP*, 650 S.W.3d 819, 824 (Tex. App.—Houston [14th Dist.] 2022, pet. denied).

### 2. Service or appearance as the 60-day trigger

The TCPA requires a dismissal motion to be filed "not later than the 60th day after the date of *service* of the legal action." Tex. Civ. Prac. & Rem. Code Ann. § 27.003(b) (emphasis added). The purpose of citation is to give the trial court jurisdiction over the parties and to provide notice to the defendant that he has been sued, by whom, and for what, so that due process will be served and so that he can appear and defend the action. *Proton PRC, Ltd. v. ET & AS Invs., Inc.*, No. 02-21-00258-CV, 2022 WL 488939, at *6 (Tex. App.—Fort Worth Feb. 17, 2022, no pet.) (mem. op.). But because an appearance can waive any defects in or lack of service, *id.*; *see* Tex. R. Civ. P. 120, the 60-day filing period begins at the earlier of service or the defendant's appearance, *Skidmore v. Gremillion & Co. Fine Art, Inc.*, No. 01-18-00829-

22

CV, 2019 WL 1119401, at *4 (Tex. App.—Houston [1st Dist.] Mar. 12, 2019, pet. dism'd) (mem. op.). To hold otherwise would allow a defendant who has appeared but who has not been served or answered "to wait until he has answered to file his motion to dismiss," which would run counter to the TCPA's early-dismissal purpose. *Id.* at *5.

### 3. "Appearance" requirements

Caselaw instructs that under certain circumstances, a defendant can appear in a case without filing an answer.[19] *See Schoendienst v. Haug*, 399 S.W.3d 313, 316 (Tex. App.—Austin 2013, no pet.) (stating that in the absence of a written answer, whether a defendant has "appeared" depends on the nature and quality of its activities in the case). This fact-specific analysis considers the nature and quality of any written documents the defendant has filed in the case, any participation in hearings, and any other personal activity by the defendant. *Id.* at 317.

A party enters a general appearance when it (1) invokes the judgment of the court on any question other than the court's jurisdiction; (2) recognizes by its acts that

---

[19]A defendant's appearance can also be evidenced through a trial court's docket entry, *see* Tex. R. Civ. P. 120, but we have learned that Tarrant County, paperless since 2019, leaves it to individual judges whether to submit docket sheets as part of the clerk's record or to maintain them among the judge's personal case notes. *See* Tex. Gov't Code Ann. § 51.807(a) (stating that a county's courts may adopt local rules for transmitting and receiving documents or reports stored or created in digital electronic or facsimile form and for recognizing those documents as the original record for file or for evidentiary purposes). Per the Tarrant County clerk, this case has no docket sheet that can be included in the record, so Rule 120 is immaterial here.

an action is properly pending; or (3) seeks affirmative action from the court. *In re Guardianship of Fairley*, 650 S.W.3d 372, 386 (Tex. 2022) (citing *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004)); *Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998); *Cannon v. Cannon*, No. 02-21-00404-CV, 2023 WL 1859881, at *5 (Tex. App.—Fort Worth Feb. 9, 2023, no pet.) (mem. op.) (quoting *Exito*, 142 S.W.3d at 304). The ultimate test is whether a party requests affirmative relief—that is, an adjudication on some question—that is inconsistent with asserting that the trial court lacks jurisdiction. *Proton PRC, Ltd.*, 2022 WL 488939, at *6; *see In re D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.—San Antonio 2015, pet. denied) ("[A] party's request for affirmative action constitutes a general appearance because such a request recognizes a court's jurisdiction over the parties, whereas the mere presence by a party or his attorney does not constitute a general appearance.").

An affirmative action could include objecting to substantive issues, *D.M.B.*, 467 S.W.3d at 104, examining witnesses, *Seals v. Upper Trinity Reg'l Water Dist.*, 145 S.W.3d 291, 297 (Tex. App.—Fort Worth 2004, pet. dism'd),[20] moving for summary judgment, *Proton PRC, Ltd.*, 2022 WL 488939, at *7, or filing a motion for

---

[20]In *Seals*, we held that the appellee made a general appearance when he participated in a hearing, stated that he had no objection to the appellant's unsworn testimony, reserved the right to place the appellant under oath, and asked the trial court to determine the scope of the pleadings—actions that "rose above the level of merely acting as a silent figurehead in the courtroom" and "impliedly recognized the trial court's jurisdiction over the parties and the pendency of the proceeding." 145 S.W.3d at 298–99.

new trial, *Grynberg v. M-I L.L.C.*, 398 S.W.3d 864, 879 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied). But a party's or that party's attorney's mere presence in court does not constitute an appearance. *Fairley*, 650 S.W.3d at 386 (citing *Seals*, 145 S.W.3d at 297). Nor is merely appearing as a witness. *Werner v. Colwell*, 909 S.W.2d 866, 870 (Tex. 1995) (op. on reh'g). And neither is entering a Rule 11 agreement that just extends a defendant's time to file an initial responsive pleading. *Exito*, 142 S.W.3d at 305–06.[21]

Agreeing to a trial court's order may sometimes constitute a general appearance. *See Schoendienst*, 399 S.W.3d at 318–19, 322. In *Schoendienst*, the court held that the act of consenting to and signing an agreed temporary injunction—one that restrained the defendant's personal freedom and ability to deal with her property and finances without any sort of reservation regarding the trial court's jurisdiction or the order's substance—constituted recognition that the underlying action was properly pending. *Id.* The court acknowledged, though, that agreeing or acquiescing to some

---

[21]In *Exito*, the defendant's Rule 11 agreement did not constitute a general appearance because it was "a typical letter agreement between the parties that did not address the trial court and in which [the plaintiff's attorney], by signing the letter, confirmed in writing that he would grant [the defendant] an extension of time to file a responsive pleading." 142 S.W.3d at 306. The letter agreement also did not recognize that the action was properly pending but merely acknowledged that the defendant had to respond to the petition in some manner. *Id.* The court noted that although filing a Rule 11 agreement with the trial court is required to enforce the agreement, it is not, in and of itself, a request for enforcement or other affirmative action by the trial court. *Id.*; *see also Dawson-Austin*, 968 S.W.2d at 323–24 (holding that continuance motion that did not request affirmative relief was not a general appearance).

form of temporary injunctive relief will not *always* constitute an appearance. *Id.* at 321;[22] *see Carey v. State*, No. 04-09-00809-CV, 2010 WL 2838631, at *3 (Tex. App.—San Antonio July 21, 2010, pet. denied) (mem. op.) (holding that agreement to extend TRO and temporary injunction—as ancillary matters—did not constitute general appearance); *see also CIBanco, S.A., Institucion de Banca Multiple v. Quezada*, 656 S.W.3d 749, 759 (Tex. App.—El Paso 2022, no pet.) (holding that participation in garnishment action, "well-recognized as being an ancillary matter," did not constitute general appearance).

Because of this nuance, we consider what an "ancillary proceeding" is: "[a]n action, either at law or in equity, that grows out of and is auxiliary to another suit and is filed to aid the primary suit, to enforce a prior judgment, or to impeach a prior decree." *Ancillary suit*, Black's Law Dictionary (11th ed. 2019); *see* Tex. R. Civ. P. 592–734 (characterizing Part VI of the Rules of Civil Procedure as "Rules Relating to Ancillary Proceedings" and listing—among other things—attachment, execution, garnishment, injunction, receivership, and sequestration); *In re M.G.M.*, 163 S.W.3d 191, 201 (Tex. App.—Beaumont 2005, no pet.) (holding that father did not waive his

---

[22]The Schlegel Defendants argue that *Schoendienst* is distinguishable because that defendant agreed to the temporary injunction's substance, not just its form. In *Schoendienst*, the pro se appellant signed an agreed temporary injunction, and after the appellees secured a default judgment against her, she argued in a restricted appeal that signing the agreed order had constituted an appearance such that she should have been notified of the default-judgment hearing. 399 S.W.3d at 315, 318–19. We take from *Schoendienst* that (sensibly) we must look to the record to determine whether a defendant has made an appearance.

special appearance when he agreed to extend the mother's temporary emergency ex parte protective order—an agreed collateral order—subject to his special appearance); *see also Exchequer Fin. Grp., Inc. v. Stratum Dev., Inc.*, 239 S.W.3d 899, 905 (Tex. App.—Dallas 2007, no pet.) (stating that signing order on the other defendants' plea in abatement "approved as to form only" was no evidence to show that appellee had requested any affirmative relief from the trial court and thus was not a general appearance).[23]

But actively arguing about an underlying suit's merits at a TRO hearing may constitute a general appearance. *Compare Kaufman v. AmeriHealth Lab., LLC*, No. 05-20-00504-CV, 2020 WL 6375336, at *4–5 (Tex. App.—Dallas Oct. 30, 2020, no pet.) (mem. op.),[24] *with Perkola v. Koelling & Assocs., Inc.*, 601 S.W.2d 110, 111–12 (Tex.

---

[23]The Schlegel Defendants clarify in their reply brief that they "are not arguing that a party can *never* make a general appearance at an ancillary proceeding, only that [they] did not do so here."

[24]In *Kaufman*, AmeriHealth sued Kaufman for tortious interference and breach of contract and sought a TRO, a temporary injunction, and expedited discovery. 2020 WL 6375336, at *1. At the TRO hearing, Kaufman's counsel appeared without limitation and actively argued that Kaufman was not a contract signatory before working out a Rule 11 agreement on discovery and a TRO extension until the temporary-injunction hearing's completion. *Id.* AmeriHealth's counsel read the Rule 11 agreement into the record and asked the trial court to order the parties to comply with it. *Id.* Kaufman's attorney added a discovery request and then stated that "everything else [AmeriHealth's attorney] said is agreed." *Id.* Kaufman later filed a special appearance, which the trial court denied. *Id.* at *2.

On appeal, AmeriHealth argued that Kaufman had made a general appearance, and our sister court agreed because Kaufman had voluntarily appeared through counsel at the TRO hearing, had succeeded in modifying the TRO based on his

App.—Dallas 1980, writ dism'd).[25] So can responding to an application for temporary

and permanent injunctive relief. *Bacharach v. Garcia*, 485 S.W.3d 600, 601–02 (Tex.

---

counsel's arguments, and had argued that he was not a contract signatory, thereby challenging AmeriHealth's breach-of-contract claim. *Id.* at *4–5. By stepping outside the role of observer and participating in the hearing, Kaufman's counsel's actions were inconsistent with asserting that the trial court lacked jurisdiction. *Id.* at *4. "Instead, counsel not only actively participated in the hearing but also sought and received affirmative relief from the trial court." *Id.* The court noted that while engaging in discovery is not enough by itself to waive a special appearance and that generally entering a Rule 11 agreement is likewise insufficient, Kaufman had agreed to terms read into the record and to "everything else" AmeriHealth's counsel said, which had included the trial court's ordering compliance with the Rule 11 agreement. *Id.* at *5; *see also Sedona Pac. Hous. P'ship v. Ventura*, 408 S.W.3d 507, 513 (Tex. App.—El Paso 2013, no pet.) (holding that appellants made a general appearance when, in a Rule 11 agreement, the appellants not only agreed to continue a temporary-injunction hearing and to cancel a pending eviction proceeding but also specifically made the agreement subject to further court orders, thereby recognizing that the case was properly pending in the trial court).

[25]In *Perkola*, after the plaintiffs sued for temporary and permanent injunctions and damages, Perkola filed a motion to transfer venue (formerly known as a "plea of privilege," *see* 2 Tex. Prac. Guide Pers. Inj. 2d § 7:844 (2023)), followed later that day by his answer and special exceptions. 601 S.W.2d at 111. Although citation had not been served on him, he also attended the temporary-injunction hearing that day. *Id.* At a later hearing, the trial court denied the venue motion. *Id.* On appeal, Perkola complained that he had not waived his venue motion by appearing at the temporary-injunction hearing, and the court agreed, stating that his appearance at the hearing on an ancillary matter was not an appearance in the main case because the temporary-injunction hearing did not resolve any of the main case's legal or factual issues, and he had done nothing else that "in any manner invoked the power of the court." *Id.* at 111–12. Forty years later, the *Kaufman* court distinguished *Perkola* as consistent with the general principle that simply attending an ancillary proceeding is not a general appearance under Rule 120a. 2020 WL 6375336, at *4. *Perkola* was not dispositive in *Kaufman* because, unlike the *Kaufman* defendant, the *Perkola* defendant had filed his venue motion before taking any other action, while the *Kaufman* defendant did not file his special appearance until after the trial court signed the TRO, and "the opinion [was] silent as to any actions that Perkola took, other than *appearing*, to contest the plea of privilege." *Id.*

28

App.—Houston [14th Dist.] 2016, no pet.) (holding TCPA motion untimely when appellant answered initial application for injunction despite lack of service).[26]

It all depends on the record, *see Schoendienst*, 399 S.W.3d at 321–22, so we turn to the record to decide if the Schlegel Defendants appeared before answering.

### 4. The record

On November 22, 2021, Choice-C4 sent Schlegel a demand letter giving her a week to accept its offer. Either on or before November 26, Schlegel hired Davis as her attorney. On November 29, Choice-C4 sued Schlegel and Freedom-C3. In its original petition, Choice-C4 brought claims for trademark and logo infringement, trade-secret and common-law misappropriation, and unlawful interference with

---

[26]In *Bacharach*, the plaintiff applied for temporary and permanent injunctive relief against the defendant for defamation and other claims. 485 S.W.3d at 601. Eight days later, the defendant filed a response to the plaintiff's application and asked the trial court to deny relief or, alternatively, to grant a continuance. *Id.* Almost a year later, the defendant filed a combined answer and TCPA motion. *Id.* at 601–02. The trial court struck the TCPA motion as untimely, and our sister court affirmed because even though the initial application for relief had no certificate of service or receipt of service, the defendant waived her complaint about lack of service when she answered the application. *Id.* at 602 ("Because Bacharach waived service by answering, she may not now rely on lack of service to justify the filing of her [TCPA] motion 23 months after the legal action against her was first filed."); *see Skidmore*, 2019 WL 1119401, at *1, *5 (holding TCPA motion untimely when, although plaintiff never served defendants, they appeared in court two days after suit was filed for a hearing on plaintiff's TRO application and then entered into an agreed TRO and two agreed extensions). In *Skidmore*, the defendants did not dispute that they had made general appearances or that they filed their TCPA motion more than 60 days after they generally appeared; instead, they argued that a general appearance was not equivalent to service unless it took the form of an answer. *Id.* at *2. The court held that their 60-day window to file a TCPA motion began to run when they made their general appearances. *Id.* at *5.

prospective business relations. Choice-C4 also sought a TRO and temporary and permanent injunctive relief to prevent Schlegel and Freedom-C3 from communicating in Choice-C4's name or, as to Schlegel, as its executive director.

On November 30, the day after Choice-C4 sued, its counsel, J. Christopher Diamond, emailed Davis, stating, "Please see the attached pleadings that were filed late yesterday" and informing Davis that he planned to schedule a TRO hearing that day. Davis replied, "For purposes of the Tarrant County local rules, *we'll want to be heard on any hearing related to a* [TRO]." [Emphasis added.] Diamond replied, "Understood, and I will reflect your position on that in the required certificate of compliance." Later that day, Diamond sent Davis a draft TRO; Davis replied with a redline order. Diamond accepted Davis's changes, sent Davis the final version, and asked for agreement on a $100 bond.

Later that day, the trial court held an unrecorded hearing. The trial court's "Agreed Temporary Restraining Order" states that it considered "the Motion, including the attached Declaration of Christine Welborn, other attachments, *argument of counsel for Plaintiff and all Defendants*." [Emphasis added.] The order granted the TRO motion in part and denied it in part based on these considerations and "in light of the Parties' agreement." Schlegel and Freedom-C3 were ordered to stop communicating in Choice-C4's name, to stop referring to Schlegel as Choice-C4's executive director, and to stop communicating "with current or prospective members, donors, and volunteers in an attempt to rebrand, rename, or otherwise cause confusion in

30

reference to the identity, leadership, and mission as[,] for[,] and between [Choice-C4] and [Freedom-C3]," as Choice-C4's original petition requested. Davis approved the agreed order "as to form." He also approved "as to form" an amended TRO the next day, which reset the temporary-injunction hearing to December 14. Davis then signed a Rule 11 agreement on December 10 that the parties would mediate as soon as practical and pass on the December 14 hearing. The Rule 11 agreement did not call for any action by the trial court.

Between December 13, 2021, and January 25, 2022, the parties exchanged emails about selecting a mediator and discovery matters.

On December 14, after someone attempted to serve Langston, a third party emailed both Diamond and Davis to complain that Langston did not reside at her address and to stop harassing her. Davis forwarded the email to Diamond and asked, "What is this? Do you want me to see if I can accept service and we can reach an agreement on an answer date? Seems like that would be easier. Let me know." Diamond replied,

> I've confirmed with my staff that we received copies of the citations in this case but did not send to our process server. *My intent was not to serve.* Apparently, someone with the clerk's office is trying to serve. I will keep looking into it. Either way, let me know if any of your folks are served, and we can deal with it by agreement. [Emphasis added.]

At the TCPA hearing, Diamond explained his "intent was not to serve" comment, stating that he thought it was "kind of an aggressive, rude move -- if somebody has already made an appearance, they already have a lawyer, they're already

31

in the case, to aggressively, harassingly serve their client." He stated that he sent the email to assure them that he knew they had appeared and had a lawyer and that he was trying not to be rude by embarrassing them through service.

On January 11, 2022, Davis sent the trial court clerk a vacation letter, asking the clerk not to schedule any hearings in the case between March 28 and April 5.

Choice-C4 filed its first amended petition on January 31, 2022, adding the PAC and tweaking its claims as we earlier described.

On February 11, the Schlegel Defendants, via Davis, informed Choice-C4, via Diamond, that Choice-C4 had materially breached the parties' Rule 11 agreement, excusing their further performance. Davis complained that despite his having "reached out on multiple occasions to arrange for and attend mediation," he had not received an acknowledgment or agreement. The Schlegel Defendants filed their answer and counterclaims against Choice-C4 that day. On April 12, they filed their TCPA motion.

### 5. The parties' arguments

If Schlegel and Freedom-C3 appeared in the case at the TRO hearing, then when Choice-C4 filed its first amended petition on January 31, Schlegel and Freedom-C3's deadline to file a TCPA motion on the new claims was April 1. But if none of the Schlegel Defendants appeared until their February 11 answer, then their TCPA motion was not due until April 12—the date they filed it.

Both parties discuss *Turner v. Turner* as to Davis's attending the TRO hearing. No. 14-98-00510-CV, 1999 WL 33659 (Tex. App.—Houston [14th Dist.] Jan. 28, 1999, no pet.) (not designated for publication). In *Turner*, the appellee sued his father's widow to terminate a trust and to enjoin her and the trust-management firm from disbursing or doing anything else with the trust's assets or dividends. *Id.* at *1. He also sought a TRO for the same injunctive relief and an accounting. *Id.* At the TRO hearing, the widow was represented by counsel. *Id.* The trial court entered a TRO and set a temporary-injunction hearing. *Id.* The widow later filed a special appearance, and neither she nor her counsel attended the temporary-injunction hearing. *Id.* at *2. The trial court later heard her special appearance and denied it. *Id.*

In the interlocutory appeal that followed, the appellee argued that the widow had entered a general appearance by participating in the TRO hearing before filing her special appearance. *Id.* But the record showed that although the widow's counsel had attended the TRO hearing, he had not filed any written pleadings or briefs and that he had explained her position and had made observations pertinent to the appellee's allegations without calling any witnesses. *Id.* at *3. He also argued against the TRO, attributing the asset-disbursement dispute to the parties' lack of communication. *Id.* at *3 & n.1. The court concluded that the widow had not generally appeared. *Id.* at *3 (relying on *Perkola*, 601 S.W.2d at 112, and *Green v. Green*, 424 S.W.2d 479,

33

481 (Tex. App.—Tyler 1968, no writ)).[27] The court stated that the appellee had sought the TRO to preserve the trust account's status quo until a hearing could be held on his temporary-injunction request and that the TRO hearing did not resolve any issues of fact or law relating to the trust's dissolution but rather related only to the ancillary matter of restraining the widow from making further disbursements. *Id.*

Relying on *Turner*, Schlegel and Freedom-C3 argue that counsel's mere appearance at a TRO hearing does not, by itself, constitute a general appearance, and they contend that nothing shows that they sought affirmative relief at the TRO hearing. Choice-C4 labels *Turner* inapplicable because the TRO hearing in this case was not ancillary but rather directly involved issues of fact and law alleged in Choice-C4's original petition and contends that Davis actively participated in the TRO

[27]In *Green*, the plaintiff moved to modify child-custody terms, and without notice to the defendant, the trial court suspended her visitation privileges and issued a show-cause order requiring her to appear and show cause why the plaintiff should not be awarded temporary custody pending the main suit's final hearing. 424 S.W.2d at 480. The defendant was served, and she and her counsel appeared at the show-cause hearing but filed no pleadings. *Id.* The trial court's order stated that the parties had agreed to continue the temporary-custody hearing. *Id.* at 480–81. The defendant then moved to transfer venue and, subject to that motion, filed an answer denying the plaintiff's allegations. *Id.* at 481. The trial court granted the venue motion, and the plaintiff appealed, claiming that the defendant had waived her venue motion by her acts and conduct because she had requested and secured a continuance before filing her motion and had submitted to the trial court's jurisdiction by agreeing to the temporary-custody order. *Id.* The Tyler court concluded that the defendant had not waived her motion because the show-cause hearing involved interlocutory orders that had "no relation to an issue of law or fact[] going to the merits of the case" and because it "was forced upon [her] by the [plaintiff]." *Id.* at 482. The court stated that the defendant's participation "in a preliminary hearing from which she could not escape would not . . . amount to a waiver of her [venue motion]." *Id.*

hearing and continued participating in the case thereafter. Choice-C4 also refers us to *Vertex Energy Operating, LLC v. Penthol LLC*, No. 4:20-CV-3901, 2021 WL 4538484, at *2 (S.D. Tex. Jan. 29, 2021), in arguing that Schlegel and Freedom-C3's actively participating in a TRO hearing and convincing the trial court to modify the TRO were actions that recognized they were subject to the trial court's authority and that the case was properly pending before the trial court.[28]

**6. Analysis**

The record reflects that Schlegel and Freedom-C3 knew on November 22, when they received Choice-C4's demand letter, that they were going to be sued, and they preemptively hired defense counsel. Diamond, Choice-C4's counsel, sent the original petition to Davis, their counsel, on November 30, and when Diamond informed Davis about the TRO hearing that day, Davis replied that Schlegel and Freedom-C3 would want to be heard, which is some indication that they would not only attend but also participate in the TRO hearing. *See Schoendienst*, 399 S.W.3d at 316–17 (stating that whether a defendant has "appeared" depends on, among other things, its participation in hearings). Davis also edited Diamond's draft TRO that day.

---

[28]In *Vertex Energy*, the federal district court noted, "Neither the Texas Supreme Court nor the Fifth Circuit have endorsed Defendant's claim that a party can never make a general appearance at an ancillary proceeding and multiple Texas Courts of Appeals have explicitly rejected it." 2021 WL 4538484, at *2 (citing *Schoendienst* and *Kaufman*). Although we are not bound by federal authority, we may rely on it as persuasive. *Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *31 n.11 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.).

35

The TRO hearing itself was not recorded, but the agreed order, signed by Davis as "agreed as to form," makes clear that the trial court considered, among other things, Davis's arguments and "the Parties' agreement" before granting the order in part and denying it in part.

In addition to a TRO, Choice-C4's original petition sought temporary and permanent injunctive relief to prevent Schlegel and Freedom-C3 from issuing communications in Choice-C4's name or in Schlegel's name as "executive director for [Choice-C4]," particularly as it related to its infringement and misappropriation claims. The TRO addressed these issues by ordering Schlegel and Freedom-C3 to stop communicating in Choice-C4's name, to stop referring to Schlegel as Choice-C4's executive director, and to stop communicating "with current or prospective members, donors, and volunteers in an attempt to rebrand, rename, or otherwise cause confusion in reference to the identity, leadership, and mission as[,] for[,] and between [Choice-C4] and [Freedom-C3]."

The TRO directly addresses activities listed in Choice-C4's original petition, and by their actions before and during the TRO hearing, Schlegel and Freedom-C3 recognized that Choice-C4's action was properly pending.[29] *See Fairley*, 650 S.W.3d at 386; *see also Schoendienst*, 399 S.W.3d at 318–19, 322 (noting that the agreed

---

[29]Although Schlegel and Freedom-C3 maintained at oral argument that the TRO order was void, it is their activities in the case—not the TRO order's validity or lack thereof—that determines whether they made an appearance sufficient to start the TCPA's 60-day deadline.

temporary injunction restrained the defendant's personal freedom without any sort of reservation regarding the trial court's jurisdiction or the order's substance). This bespeaks more than mere presence as a "silent figurehead in the courtroom." *See Seals*, 145 S.W.3d at 298–99; *see also Kaufman*, 2020 WL 6375336, at *2, *4–5. Further, one of Choice-C4's primary goals in filing suit was to stop the activities addressed in the TRO. *Cf. M.G.M.*, 163 S.W.3d at 201; *Ancillary suit*, Black's Law Dictionary (11th ed. 2019).

We conclude that Schlegel and Freedom-C3 made an appearance at the November 30 TRO hearing, making their TCPA motion due on April 1. Because they did not file the motion until April 12, it was untimely as to them, and the trial court did not err by denying it. We overrule this portion of the Schlegel Defendants' first issue.

But because Choice-C4 does not argue that the motion was untimely as to the later-added PAC, we will address the merits of the PAC's portion of the TCPA motion.

## B. The PAC's appeal

The PAC argues that the TCPA applies to Choice-C4's claims that pertain to public statements about vaccine choice and the PAC's public advocacy and that no statutory exemptions apply. Choice-C4 responds that the TCPA does not apply to its claims because they relate to a private business dispute regarding its right to control and access its own confidential information and Schlegel's obligation to return its

property. Choice-C4 further argues that the Legislature has exempted its claims from the TCPA because its claims are based on recovery for trade-secret and corporate-opportunity misappropriation We conclude that Choice-C4's exemption argument is meritorious.

### 1. TCPA burden-shifting framework; exemptions

Ordinarily, the first step in the TCPA burden-shifting analysis is for the movant to show that the lawsuit is "based on or is in response to," here, the movant's exercise of the right of free speech or association. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); *see also id.* § 27.005(b). If so, the nonmovant must then establish by clear and specific evidence a prima facie case for each essential element of the claim in question. *Id.* § 27.005(b)–(c). If the nonmovant meets this burden, the movant may obtain a dismissal under the TCPA by establishing an affirmative defense or other grounds on which it is entitled to judgment as a matter of law. *Id.* § 27.005(d).

But the TCPA also contains exemptions to its applicability. *Id.* § 27.010(a) (listing actions to which the TCPA does not apply). Our sister court in Dallas has held that when both step one *and* an exemption are at issue, judicial economy warrants analyzing the contested exemption first: if the action is of a type listed in section 27.010, the step one analysis is pointless. *Temple v. Cortez Law Firm, PLLC*, 657 S.W.3d 337, 346 (Tex. App.—Dallas 2022, no pet.) ("When a TCPA movant's step-one burden and a nonmovant's TCPA exemption are both disputed, we conclude that a court may consider a nonmovant's exemption first, if it chooses to do so. . . . Our

appellate rules support this simply as a matter of judicial economy."). Finding this a sensible approach that neither the TCPA nor controlling caselaw forbids, we will skip straight to the parties' competing arguments about whether a TCPA exemption applies. *See id.*; *see also* Tex. R. App. P. 47.1 (stating that the court "must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

If an action falls under a TCPA exemption, the TCPA may not be used to dismiss it. Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a). The party asserting the exemption must prove it by an evidentiary preponderance. *NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 445 (Tex. App.—Fort Worth 2023, pet. filed). We may determine a TCPA exemption's applicability from the pleadings, viewed in the light most favorable to the nonmovant. *Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 281 (Tex. App.—Tyler Aug. 30, 2021, pet. denied). We must determine whether each individual cause of action falls within an exemption. *Id.* at 282.

### 2. Choice-C4's allegations and causes of action

Choice-C4 alleged that Schlegel and Hardy were both instrumental in forming Choice-C4 based on their political activities, from 2015 onward, surrounding "medical freedom, bodily autonomy, individual rights, and parental choice." Choice-C4, Freedom-C3, and the PAC had related but distinct missions for which Choice-C4, as a 501(c)(4), took the lead on lobbying; Freedom-C3, as a 501(c)(3), limited its activities

to authorized educational efforts; and the PAC raised funds to spend on direct political activity. Choice-C4 recounted that Schlegel had been on the boards of both Choice-C4 and Freedom-C3, had been Choice-C4's executive director, and had been the PAC's treasurer, imposing upon her fiduciary duties as to all three entities. Choice-C4 also stated that Schlegel had executed a nondisclosure agreement restricting her activities apart from that entity that might conflict with its best interests and that her initiating a transfer from Choice-C4's bank account to Freedom-C3's bank account was unauthorized and tantamount to winding down Choice-C4.

Choice-C4 alleged that despite Schlegel's ejection from its board and her dismissal as its executive director in November 2021, she had "persisted in attempting to speak on behalf of [Choice-C4], to use [its] marks, and to restrict and control [its] assets, including [its] social media webpages and mailing lists" and had persisted in efforts to operate Freedom-C3 and the PAC "despite a lack of consent by [Choice-C4] to the operation of those entities under those names." Choice-C4 stated that by "using the names Texans for Vaccine Freedom and Texans for Vaccine Choice PAC," the Schlegel Defendants were "causing confusion, violating [Choice-C4's] trademarks, utilizing protected business opportunities[] and confidential information, all while trying to 'rebrand' themselves under a new name"—despite the agreements Schlegel had signed during her Choice-C4 employment.

As to the PAC, Choice-C4 sought recovery for the PAC's trademark and logo use, alleging that it owned the words "Texans for Vaccine Choice" and the related

logo and used them to identify its services; that if the PAC were allowed to continue to use them without Choice-C4's consent, it would cause confusion among ordinary consumers as to the "source, sponsorship, affiliation, or approval of the services"; and that Choice-C4 had suffered damages because of the PAC's unauthorized use of these items.

Choice-C4 also sought recovery for unlawful interference with existing and prospective business relations and contracts, alleging that it would be "impossible to move forward" with its purpose when an entity "no longer . . . under [its] control . . . continue[d] to send communications to the public using [Choice-C4's] platform, logo, name, and mission." And it sought the following declarations: (1) that Choice-C4 was entitled to the exclusive continued use of the name "Texans for Vaccine Choice"; (2) that Choice-C4 was entitled to the exclusive use of the Choice-C4 logo; (3) that Choice-C4 was entitled to withdraw its consent to the PAC's use of the similar name "Texans for Vaccine Freedom"; and (4) that Choice-C4 had a right and obligation to control the PAC's activities.

### 3. Analysis

The TCPA does not apply to "a legal action *arising from* an officer–director, employee–employer, or independent-contractor relationship that . . . seeks recovery for misappropriation of trade secrets or corporate opportunities." Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(5)(A) (emphasis added). The TCPA does not define "arising from," but the ordinary meaning of "arise" is "to originate; to stem from."

41

*Baylor Scott & White*, 633 S.W.3d at 285. The party against whom the exemption applies need not even be a party to the contract as long as the legal action arises from that relationship. *Id.* at 286. "Unfair competition," for example, which includes common-law misappropriation, is an umbrella for "a number of types of objectionable trade practices, including trademark infringement, dilution of good will, misappropriation of business value, palming off, passing off, and theft of trade secrets." *Id.* at 286–88 (holding that nonmovant's unfair-competition and Texas Uniform Trade Secrets Act (TUTSA) claims for trade-secret misappropriation fell within Subsection (a)(5)'s exemption).

In its TCPA response, Choice-C4 argued that each of its claims was specifically and explicitly exempted under the TCPA. The PAC counters that an exemption cannot apply to it because it did not have a director–officer, employer–employee, or independent-contractor relationship with Choice-C4. The PAC further argues that the exemption does not apply because Choice-C4 dropped its trade-secrets-misappropriation claim.

To its TCPA response, Choice-C4 attached documents showing its history, its trademark and logo development, and public and donor confusion about the status and similarity of the entities' names. Choice-C4 also attached the April 2021 nondisclosure agreement executed by Schlegel as well as her Choice-C4 handbook and signature.

42

The nondisclosure agreement provided that "[a]ll written and oral information and materials disclosed or provided by the Employer to the Employee under this Agreement constitute Confidential Information regardless of whether such information was provided before or after the date of this Agreement or how it was provided to the Employee." It defined "Confidential Information" as "all data and information relating to the business and management of the Employer," including customer information, intellectual property, marketing and development information, business operations, product information, and service information, among other things, and it included an employee acknowledgment that all rights, title, and interest in any confidential information—including any trademarks or trade names—remained Choice-C4's exclusive property even if the employee "may have created or contributed" to their creation.

The nondisclosure agreement included Schlegel's agreement that Choice-C4 would be entitled to an injunction restraining "the Employee, any of its personnel, and any agents of the Employee, from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information." Choice-C4 included its membership lists as "confidential information" under the agreement, as well as "all posts, comments[,] and replies in all secret [Choice-C4]-affiliated Facebook groups as well as private messages and texts."

The nondisclosure agreement also addressed avoiding conflict of opportunities, stating,

It is understood and agreed that any business opportunity relating to or similar to the Employer's current or anticipated business opportunities coming to the attention of the Employee during the Employee's employment is an opportunity belonging to the Employer. . . . Without the written consent of the Employer, the Employee further agrees not to directly or indirectly, engage or participate in any business activities which the Employer, in its reasonable discretion, determines to be in conflict with the best interests of the Employer.

The Choice-C4 employee handbook prohibited departing and former employees from using or disclosing Choice-C4's nonpublic information in any future employment without advance written permission from Choice-C4's senior management. It included the following acknowledgment, which Schlegel signed, stating, "I . . . agree that after my employment with [Choice-C4] terminates, I will not disclose or use any inside or confidential information or trade secrets concerning, belonging to, or developed by or for [Choice-C4]."

Here, Choice-C4's individual causes of action against the PAC are trademark and logo infringement, tortious interference, and the four declarations.[30] The requested declarations flow from Choice-C4's right to use its name and logo, the ability to withdraw consent to the PAC's use of a similar name, and the right to control the PAC. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440,

---

[30]In its cross-appellee's brief, Choice-C4 states that it added "a solitary claim against the PAC," but nothing in Choice-C4's amended petition specifically indicates that it did so. To the contrary, the amended petition makes clear that the contract-breach and fiduciary-duty-breach claims are brought against Schlegel individually but that the claims for trademark and logo infringement and unlawful interference with business relations and contracts are brought against "Defendants," which includes the PAC.

444 (Tex. 1993) (construing Uniform Declaratory Judgments Act as "merely a procedural device for deciding cases already within a court's jurisdiction").

Choice-C4's amended petition and the evidence attached to its TCPA response established that its legal action arose from the actions of Schlegel, acting as an officer, acting individually, and acting through Freedom-C3 and the PAC. Choice-C4's lawsuit seeks recovery for misappropriation of its trade secrets,[31] as listed in the agreement and employee handbook, and for misappropriation of corporate opportunities in the form of interference with its donors, also in violation of the agreement. While speech and association are implicated in the uses to which the PAC (through Schlegel) has put Choice-C4's trademark, logo, and confidential information, these claims arose from Schlegel's activities in violation of her internal agreements with Choice-C4. Accordingly, we conclude that the claims fall within the TCPA's Section 27.010(a)(5) exemption, *see Baylor Scott & White*, 633 S.W.3d at 285–88, and that the trial court did

---

[31]The PAC argues that Choice-C4 failed to plead a trade-secret-misappropriation claim, which requires showing that a trade secret existed, that it was acquired through the breach of a confidential relationship or discovered by improper means, that it was used without authorization, and that the owner suffered damages as a result. *See Snowhite Textile & Furnishings, Inc. v. Innvision Hosp., Inc.*, No. 05-18-01447-CV, 2020 WL 7332677, at *4 (Tex. App.—Dallas Dec. 14, 2020, no pet.) (mem. op.) (listing elements of trade-secret misappropriation under TUTSA); *Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 109 (Tex. App.—El Paso 2010, no pet.) (listing elements of common law trade-secret misappropriation claim). But TUTSA defines "trade secret" broadly to include "all forms and types of information," including "list of actual or potential customers or suppliers, whether tangible or intangible," Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6), which—for a nonprofit—could include donors, and Choice-C4's factual allegations support these elements.

45

not err by denying the PAC's TCPA motion. We overrule the Schlegel Defendants' second issue.[32]

## C. Stickland's appeal

Stickland and Schlegel agree that the TCPA's first step is satisfied. Stickland argues that Schlegel failed to meet her second-step burden to establish by clear and specific evidence a prima facie case for each element of her defamation claim: that he published to a third party a false and defamatory statement of fact that referred to her with actual malice and—depending on whether she sufficiently alleged defamation per se—that she was damaged thereby. *See Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623–24 (Tex. 2018) (reciting threshold defamation elements and noting that defamation per se "occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages").[33]

### 1. Prima facie case

Under the TCPA, a prima facie case "is the measurement the Legislature selected to distinguish genuine claims from suits brought to harass or silence," and it

---

[32]Based on this disposition, we do not reach the Schlegel Defendants' third issue, which pertains to whether Choice-C4 met its prima facie burden under the TCPA.

[33]Statements that injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Tatum*, 554 S.W.3d at 624. So is accusing someone of a crime. *Id.* at 638 (citing *Lipsky*, 460 S.W.3d at 596). Schlegel contends that Stickland's defamatory statements falsely accused her of committing a crime (theft) and were actionable per se.

is "not a high hurdle." *USA Lending Grp.*, 669 S.W.3d at 198. To the contrary, "it is that minimum quantity of evidence necessary to rationally infer that an allegation is true." *Id.* Evidence is "clear and specific" if it provides enough detail to show the claim's factual basis, and such evidence "need not be conclusive, uncontroverted, or found credible."[34] *Id.* at 200. Instead, under the TCPA, prima facie evidence "is taken at face value." *Id.* at 203. This is because the TCPA stage is not a battle of evidence; rather, the TCPA's purpose is to "screen[] out plaintiffs certain to fail—those who cannot support their claims with clear and specific evidence."[35] *Id.* at 205. At the TCPA stage, a claim survives if the evidence "is legally sufficient to establish a claim as factually true if it is not countered." *Id.* at 204. But mere notice pleading—general allegations that recite a cause of action's elements—will not suffice. *Lipsky*, 460 S.W.3d at 590–91.

---

[34]But the court also cited *Lipsky* for the proposition that prima facie evidence is that "sufficient as a matter of law to establish a given fact *if it is not rebutted or contradicted.*" *USA Lending Grp., Inc.*, 669 S.W.3d at 203 n.33 (emphasis added) (quoting *Lipsky*, 460 S.W.3d at 590).

[35]In *USA Lending Group*, the court held that the plaintiff met its prima facie burden on legal malpractice despite the defendant's challenge to its causation and damages evidence. 669 S.W.3d at 200–01. The plaintiff proffered an affidavit from its CEO, which sponsored a variety of financial records, as well as three expert affidavits addressing the standard of care, breach, damages, and collectability. *Id.* at 201. The court noted that while a general averment of loss, like any conclusory opinion, would not be sufficient, the plaintiff's evidence included both expert affidavits and evidence of demonstrable out-of-pocket expenses, establishing that it "suffered *some* specific, demonstrable injury attributable to [the defendant's] conduct." *Id.* at 202.

In determining whether a legal action should be dismissed under the TCPA, the trial court "shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *2 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.). We view the pleadings in the light most favorable to the nonmovant, favoring the conclusion that the claims are not predicated on protected expression, and we disregard as irrelevant any factual allegations that are not a factual predicate for the claims. *Newstream Hotels & Resorts, LLC v. Abdou*, No. 02-21-00343-CV, 2022 WL 1496537, at *2 (Tex. App.—Fort Worth May 12, 2022, pet. denied) (mem. op.).

A TCPA nonmovant must provide enough detail in a defamation case to establish the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged her. *Lipsky*, 460 S.W.3d at 591. If neither the pleadings nor the evidence provides the requisite details, the party has failed to meet its burden of proof, and the TCPA movant is entitled to dismissal. *NexPoint Advisors*, 674 S.W.3d at 445.

### 2. Falsity

A publication's meaning, and thus whether it is false and defamatory, depends on a reasonable person's perception of the publication's entirety and not merely on individual statements. *Lipsky*, 460 S.W.3d at 594. Further, if a statement is not

48

verifiable as false, it is not defamatory. *Tatum*, 554 S.W.3d at 624. When a statement is not literally true, it may be substantially true if it is no more damaging to the plaintiff's reputation than the truth would have been. *See id.* at 641; *see Dall. Morning News, Inc.*, 579 S.W.3d at 377 (stating that to be "not false," a statement need not be perfectly true as long as it is substantially true). To recover for defamation, a public official must prove that defamatory statements made about her were false. *Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex. 2002); *see also Dall. Morning News, Inc.*, 579 S.W.3d at 380 ("Rxpress fails to establish a prima facie case that the News's reporting was not substantially true."). In construing a statement to determine whether it was defamatory, we view it as a whole in light of the surrounding circumstances based on how a person of ordinary intelligence would perceive it. *Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at *8 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (mem. op.).

### a. Schlegel's amended pleadings

In her first amended petition against Stickland, Schlegel alleged that he had accused her of crimes she did not commit after, despite his threats and bullying, she had refused to "play ball" with his attempt to control the messages of Choice-C4 and Freedom-C3 and to use them to support his favored political candidates. Specifically, she alleged:

- "Mr. Stickland has published statements to third-parties that Ms. Schlegel stole money from [Choice-C4]—a factual accusation that Mr. Stickland knew to be false."

49

- "It was the common practice of [the] PAC to move money to the other two organizations several times a year," and "on November 18, 2021, Ms. Schlegel attempted to transfer money from [Choice-C4] to [Freedom-C3]. The attempted transfer had specific business purposes, accorded with a written action plan, and sought the best interests of the vaccine choice movement," and Schlegel "did not require advance approval" of the Choice-C4 board to transfer the funds.

- Hardy and Welborn, the other Choice-C4 directors, learned of the attempted transfer and blocked it, and "[b]ecause the initiated transfer was immediately blocked, no money moved out of the [Choice-C4] bank account."

- Stickland "was working behind the scenes to undermine . . . Schlegel, wrestle control of [Choice-C4] from her, and minimize [her] platform. . . Stickland and his supporters have been defaming [her], knowingly spreading lies to attack [her] reputation and cover their backroom conduct."

- Hardy and Welborn later admitted that no money was moved from Choice-C4 through Schlegel's attempted transfer, and they explicitly conceded that the attempted transfer was irrelevant to her removal. "It was irrelevant because Ms. Schlegel's purported removal was about politics—anger about Ms. Schlegel's desire to remain neutral among elected politicians and anger about [her] refusal to become a champion for, and lend her organization's resources to, the [Don] Huffines gubernatorial campaign."

- Stickland "has repeatedly told individuals that Ms. Schlegel 'stole money' from [Choice-C4]. One of the individuals was . . . Beckmeyer, whom Mr. Stickland told that Ms. Schlegel stole money on November 22, 2021. . . . He made the statement in a matter-of-fact tone. He did not indicate that he was expressing an opinion or making a joke. He did not retract his statement."

- "On information and belief, Mr. Stickland has made similar defamatory comments to numerous other individuals, including current, and potential, donors to [Choice-C4] and [Freedom-C3] as well as Texan grassroots organizers and supporters. For example, there was a meeting of a dozen or so Texas grassroots leaders in December 2021. During that meeting, the attendees were asked whether any of them had heard that Ms. Schlegel had stolen money. All the attendees confirmed that [they] had heard those accusations," and many had heard the accusations "from Stickland or his allies."

- "Stickland also told . . . McCarty that Ms. Schlegel stole money from [Choice-C4]," and McCarty repeated that lie in a Facebook post linked to Stickland.[36]

- "Due to his personal relationships with other board directors for [Choice-C4], Mr. Stickland knew that no money was transferred out of [Choice-C4] and that Ms. Schlegel never stole any money from the organization. His contacts at [Choice-C4]—[Hardy and Welborn]—knew that no money had been moved because they immediately stopped the transfer. Upon information and belief, when [Hardy and Welborn] spoke with Mr. Stickland on or after the evening of November 18, 2021[,] but before November 22, 2021, they told him what they knew about the attempted transfer having already been stopped."

- "[U]pon information and belief, Mr. Stickland has admitted to at least one person that he knows Ms. Schlegel did not steal any money from [Choice-C4] and that Ms. Schlegel had the legal authority to initiate the transfer regardless" as a Choice-C4 board director and as Choice-C4's executive director.

- "Mr. Stickland made the false statements to Ms. Beckmeyer and others about Ms. Schlegel with the purpose and intent of damaging Ms. Schlegel's reputation. He made the false and disparaging comments despite knowing they were false or despite entertaining serious doubts about the truth of the information."

- "Upon information and belief, Mr. Stickland published substantially similar 'Jackie stole money' defamatory falsehoods to third parties in November 2021, December 2021, and/or January 2022."

- Schlegel "has suffered harm to her reputation, mental anguish and/or economic damages."

### b. Schlegel's TCPA response

In her TCPA response, Schlegel relied primarily on her amended petition's allegations. She also attached her unsworn declaration,[37] ten pages of excerpts from

---

[36]We earlier quoted McCarty's undated Facebook post that Schlegel inserted into her amended petition.

[37]In her unsworn declaration, Schlegel set out her history with Choice-C4, Freedom-C3, and the PAC and asserted that in 2021, Hardy's joining Huffines's

51

the Beckmeyer deposition,[38] and pages 34–37 and 66–69 of the Beckmeyer–Choice-C4 meeting transcript.[39] Her response focused on (1) the Beckmeyer statement; (2) the McCarty Facebook post; and (3) Stickland's having allegedly told other, unidentified people that she stole money.

---

gubernatorial campaign as a paid staffer had changed their relationship because Hardy wanted Schlegel to "partner with her on Huffines-related efforts" and for Schlegel, Choice-C4, and Freedom-C3 "to openly criticize the sitting Governor, who was [Hardy's] boss's most formidable opponent in the primary election."

[38]In those excerpts, Beckmeyer stated that she had known Schlegel since 2016, that they were friends, that she considered Schlegel to be trustworthy and—from what she knew of Schlegel—beyond reproach. She did not recall portions of the demand letter that Starnes had read to her or whether Schlegel had told her that Saturday that she had actually not transferred the funds. She stated that the way she recalled Stickland's statement during their phone call was "Have you heard [Choice-C4] is having a problem, [Schlegel] stole money," that he told her that the board told him that, and that when she asked, he said he had not contacted the board or Schlegel for proof. Beckmeyer stated that she understood the other board members believed that transferring the money equated to theft but that she disagreed with them, although everyone agreed that Schlegel "did initiate a transfer." Beckmeyer agreed that one of the disputes was whether Schlegel had the authority to transfer the funds.

Stickland attached to his TCPA motion Beckmeyer's entire deposition (86 pages), including deposition exhibits.

[39]One page of the transcript contains a sentence by "female speaker" that says, "But really, the money transfer is really irrelevant to [Schlegel's] removal" because Schlegel had made it clear that Choice-C4's board would have to fire her "in order to get [Choice-C4] back on its original mission . . . and it's just the timing of her removal seems to be the issue." But many female speakers were at that meeting, including Beckmeyer.

52

### c. Analysis

Stickland argues that as to the second and third allegedly defamatory statements—the McCarty Facebook post and his having told other, unidentified people that she stole money—Schlegel failed to produce evidence that he was the statement's speaker and that in one of those two statements, she also failed to plead what was said. Stickland asserts that the only adequately pleaded statement was his alleged statement to Beckmeyer and that it was true or substantially true.

We agree with Stickland that the second and third statements are not supported by sufficient clear and specific evidence because they do not provide enough details. *See Lipsky*, 460 S.W.3d at 591; *see also Nguyen v. Trinh*, No. 14-21-00110-CV, 2022 WL 805820, at *6 (Tex. App.—Houston [14th Dist.] Mar. 17, 2022, no pet.) (mem. op.) ("Because appellee failed to provide the trial court or this court with the content in which he asserts he was defamed, neither the trial court, nor this court, could review the entirety of the publications to determine whether appellant made false statements of fact defaming appellee."); *Rogers v. Soleil Chartered Bank*, No. 02-19-00124-CV, 2019 WL 4686303, at *7 (Tex. App.—Fort Worth Sept. 26, 2019, no pet.) (mem. op.) (noting that a party's choosing to rely on its pleading "gambles that the often-times conclusory and sketchy allegations of a notice pleading will not satisfy the clear and specific burden of establishing a prima facie case").

But we are not required to determine that each statement Stickland made is false and defamatory. *See Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at

*9 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.). Instead, we need only determine whether *any* of Stickland's alleged statements were false and defamatory. *See id.* Schlegel's amended petition and the Beckmeyer deposition excerpts establish that on November 22, 2021, Stickland told Beckmeyer that Schlegel stole money; these items establish when the statement was made and what was said. Accordingly, we must next consider whether Schlegel established through prima facie evidence that this statement was false. *See id.* (citing *Lipsky*, 460 S.W.3d at 591); *see also Bentley*, 94 S.W.3d at 586. To do so, we must determine whether the statement was substantially true. *Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at *1 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.).

A publication is not substantially true if, taken as a whole, it is more damaging to the plaintiff's reputation than a truthful publication would have been. *Id.* at *8. The publication's meaning is determined by construing it as a whole in light of the surrounding circumstances based on how a person of ordinary intelligence would perceive it. *Id.*[40]

---

[40]Further, the supreme court has instructed us that if we determine that a statement is capable of defamatory meaning and *only* defamatory meaning, then a jury plays no role in determining its meaning. *Tatum*, 554 S.W.3d at 632 (discussing defamation by implication). If, on the other hand, we determine that a statement is capable of at least one defamatory meaning and at least one non-defamatory meaning, then it is for the jury to determine whether the defamatory sense was the one conveyed. *Id.* If we determine that the statement is not capable of any defamatory meaning, then the statement is not defamatory as a matter of law, and the claim fails. *Id.*

In *Weber*, a TCPA case, we considered a Facebook post made about the plaintiff, a former city councilmember. *Id.* It stated, in pertinent part, "[The plaintiff] is a convicted criminal, he commite [sic] robbery while being a Kennedale city council member." *Id.* The plaintiff's defamation claim was based on the fact that he had not been charged with robbery and had not been convicted of any crime. *Id.* at *9. In actuality, he had pleaded guilty to theft—not robbery—in exchange for deferred adjudication community supervision, for which there was no judgment of conviction. *Id.* We concluded that the statement that he was a "convicted" criminal was no more damaging than if he had more accurately been described as having pleaded guilty to misdemeanor theft in exchange for deferred adjudication. *Id.* at *11–12.

We likewise concluded that a statement in an online video that the plaintiff was a "known thief" who "stole from somebody" was also substantially true and no more damaging than a true statement would have been because it was undisputed that he had been charged with theft and had pleaded guilty to the offense. *Id.* at *12. *But see id.* at *22 (Gabriel, J., dissenting) ("In other words, [according to the majority,] close enough is good enough to refute falsity regarding the imputation of crime in the TCPA context."). But the robbery reference in the Facebook post "falsely imputed to [the plaintiff] the additional act of committing or attempting to commit violence or threatening violence against a person," and the statements containing these references were not substantially true because they were more damaging than the true statements

that he was charged with misdemeanor theft and pleaded guilty to it. *Id.* at *13.[41] We nonetheless reversed the denial of the TCPA motion on the defamation claim because the plaintiff failed to meet his burden to show clear and specific evidence of actual malice. *Id.* at *18, *20.

Stickland did not dispute that he made a statement to Beckmeyer. Rather, in his amended TCPA motion he stated that it was undisputed that he had conveyed to Beckmeyer that Choice-C4's board had accused Schlegel of stealing and that "whether Schlegel did essentially try, in layman's terms, to steal the money, . . . [is] being litigated in another case in this sprawling litigation."[42] Other evidence shows that the

---

[41]In *Lilith Fund for Reproductive Equity v. Dickson*, the supreme court recently concluded that challenged TCPA statements about "murder" were protected opinions about abortion law made in pursuing a change in that law. 662 S.W.3d 355, 357–58 (Tex. 2023). This is because whether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law answered from the perspective of a reasonable person's perception of the communication's entirety, not from isolated statements. *Id.* at 363. In *Lilith Fund*, the defamation defendant's tone and language were "exhortatory, not factual," providing clues to the reader that his purpose was advocacy, not fact dissemination. *Id.* at 367. As Schlegel pointed out in her letter of supplemental authority regarding that case's political backdrop, allegations of "murder" are distinct on many levels from theft, and no parallel debate exists about "whether stealing money constitutes a crime" or about "the propriety of transferring money between" nonprofit organizations.

[42]This is not a case like *Van Der Linden*, in which alleged private comments made between the parties were later published by the defendant to the plaintiff's business partners. 535 S.W.3d at 186, 198–202. Only the parties in that case knew whether the plaintiff had actually made the comments, so the plaintiff—who was not a public figure and therefore had a negligence burden—met his TCPA prima facie requirement on both falsity and negligence when he denied in his affidavit that the conversation had ever taken place. *Id.* at 185, 201–02. No one denies that Stickland made a statement to Beckmeyer about Schlegel.

allegation's gist was that *Choice-C4's board* alleged that Schlegel had attempted to transfer money from Choice-C4 to Freedom-C3, an entity she controlled, without the legal authority to do so,[43] a statement that is not more damaging (or less true) than the actual statement that she had stolen money from the nonprofit organization.[44] Because the record reflects that the statement is substantially true, *see Weber*, 2019 WL 1395796, at *8, we sustain Stickland's second issue and do not reach his remaining issues regarding TCPA evidence and whether he established an affirmative defense. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having overruled the Schlegel Defendants' first and second issues, we affirm the trial court's order denying their TCPA motion. Having sustained Stickland's second issue, we reverse the trial court's order denying his TCPA motion, render judgment granting his TCPA motion, and remand the case to the trial court to determine attorney's fees, costs, and potential sanctions. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009. We deny Choice-C4's cross-point request for sanctions under

---

[43]In its cross-appellee's brief, Choice-C4 refers to Schlegel's "inappropriate attempt to steal eighty percent of [Choice-C4's] operating funds."

[44]Or, as Stickland stated in his opening brief, "Like a bank robber who is stopped by the police before he makes his getaway, the fact that [Schlegel's] attempt to appropriate the money was thwarted does not render the statement at issue false." In his reply brief, he reiterates, "Taking money that doesn't belong to you can fairly be characterized as 'stealing.'" *See* Tex. Penal Code Ann. § 31.03(a), (b)(1) (defining theft as the appropriation of property without the owner's effective consent and with the intent to deprive the owner of the property).

Rule of Appellate Procedure 45 because, as discussed above, the Schlegel Defendants'

appeal contains at least one arguable issue.[45]


/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  November 22, 2023

---

[45]Although we ultimately concluded that the Schlegel Defendants' arguments on the appearance and exemption issues lacked merit, the extensive analysis required in reaching that conclusion suggests that those issues were not frivolous.